UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 99-10272
_____

CARVER DAN PEAVY; SALLY PEAVY,

Plaintiffs-Appellants/Cross-Appellees,

versus

WFAA-TV, INC.; ROBERT RIGGS,

Defendants-Appellees/Cross-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Texas

_____
July 31, 2000
Before POLITZ, JOLLY, and BARKSDALE, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

Primarily at issue is whether the First Amendment shields WFAA-TV, Inc., and its reporter, Robert Riggs, from liability for their "use" and "disclosure", in violation of the Federal and Texas Wiretap Acts, of the contents of the Peavys' cordless telephone conversations, illegally intercepted and recorded by the Harmans, with them providing the recordings to Riggs and with Riggs and WFAA having some participation concerning the interceptions, at least as to their extent. Numerous other federal and state law issues are presented, including whether defendants "procured" or "obtained" the Harmans to make the interceptions, in violation of the Federal and Texas Acts, respectively, and whether the Federal Act even

permits a civil action for damages for such "procurement". The district court granted summary judgment for WFAA and Riggs, holding, *inter alia*: the Harmans were neither so "procured" nor "obtained"; and even though defendants engaged in proscribed "use" and "disclosure", the First Amendment trumps the two Acts. We **AFFIRM in part; REVERSE in part; VACATE in part;** and **REMAND**.

## I.

The facts are largely undisputed. The following is drawn, in part, from the magistrate judge's recommendation, adopted by the district court without a separate opinion. *Peavy v. Harman*, 37 F. Supp. 2d 495, 502-04 (N.D. Tex. 1999).

Carver Dan Peavy (Peavy) was elected a trustee for the Dallas Independent School District (DISD) in 1986, so serving until 1995. By the early 1990s, he controlled purchases of insurance for DISD employees. He was a friend and business associate of Eugene Oliver, an insurance agent who had been convicted as an accomplice to murder. The Peavys had been long involved in various, ongoing disputes with their neighbors, Charles and Wilma Harman. *Id*. at 502 n.2.

In early December 1994, Charles Harman (Harman) acquired a police scanner, in order to monitor police activity in his neighborhood. The first time he turned it on, he overheard a telephone conversation between Peavy and another neighbor, in which they discussed filing a class action against the Harmans. *Id*. at

502. Thereafter, Harman locked the scanner onto the frequency for the Peavys' cordless telephone, and continued listening to their conversations. Harman overheard conversations which he interpreted as threats to his safety, and some involved what he perceived to be public corruption on the part of Peavy involving insurance at DISD. *Id.* Shortly thereafter, Harman began recording the intercepted conversations. *Id.*

The Harmans claimed to have consulted with various law enforcement officials regarding the legality of intercepting and recording cordless telephone calls, and to have been told it was legal. *Id.* (However, in a related proceeding, subsequent to the summary judgment in this case, the magistrate judge found that no one told the Harmans such interception was legal. *See* ***Goodspeed v. Harman***, 39 F. Supp. 2d 787, 793-94 (N.D. Tex. 1999).)

Frustrated at the lack of police response to his reports of Peavy's threats and public corruption, Harman contacted WFAA on 8 December 1994, and spoke with one of its producers, P. J. Ward. *Id.* at 503. Harman told Ward he had information about possible corruption by an elected official, who he eventually identified as Peavy. *Id.* Ward relayed the tip to Riggs, a WFAA investigative reporter. *Id.*

Riggs telephoned Harman that afternoon. *Id.* Harman told Riggs he: had proof Peavy was threatening to harm him and was involved in an insurance kickback scheme; was concerned for his

3

family's safety; and wanted to talk to Riggs in person. *Id*. Riggs had never heard of Peavy and was *not* working on a story about DISD insurance.

The next day, Riggs went to the Harmans' home. *Id*. They told him about their history with Peavy; hearing, with a police scanner, his threats and discussions of insurance kickbacks; and taping his conversations. They told Riggs about the contents of overheard, but *not* recorded, conversations; played a tape of recorded conversations; and showed him the scanner. Riggs knew the parties to those conversations were *not* aware of, and did *not* consent to, the interception and recording.

Riggs claimed: he asked Harman, at their initial meeting, whether it was legal to record the conversations; and Harman assured him his actions had been approved by the Dallas County District Attorney and the Dallas Police Department. *Id*. On the other hand, the Harmans claim Riggs told them he had consulted with WFAA's attorney about the legality of the intercepts *prior* to their meeting. Riggs denied then consulting counsel and stated he did *not* do so until a few days later.

At their initial meeting, Harman asked Riggs whether he wanted a copy of the tape, as well as others he (Harman) might make in the future. *Id*. Riggs replied he did. *Id*. He also instructed the Harmans *not* to turn the tape recorder on and off while recording

4

intercepted conversations, and *not* to edit them, so that the tapes' authenticity could *not* be challenged. *Id*.

Riggs took the tape of the intercepted conversations to WFAA; met with Ward and WFAA News Director John Miller; told them about his meeting with the Harmans; and played portions of the tape for them. *Id*. They agreed Peavy's activities should be investigated. *Id*. After that meeting, Riggs asked another WFAA employee to conduct research regarding the contents of the tape, and instructed Ward to conduct other research at DISD.

WFAA asked its outside legal counsel, Paul Watler, whether it was lawful for WFAA to receive tapes of the intercepted and recorded cordless telephone conversations. At a meeting with Riggs and Miller on 12 December 1994, Watler advised he would have to double-check, but thought it legal to intercept and record *cordless* telephone conversations. At a meeting at WFAA on 4 January 1995, Watler told Riggs: it was legal to listen to, and record, cordless telephone conversations; and WFAA could *legally* accept and broadcast the tapes.

In February 1995, Ward and Watler decided to have portions of the tapes transcribed. Ward selected for transcription those portions she believed would illustrate to Riggs, Miller, and Watler the evidence of public corruption and racial discrimination. At Watler's suggestion, Ward had them transcribed by a court reporter

5

in Austin, Texas, and took measures to ensure the confidentiality of the tapes and transcripts.

After the transcript was prepared, Ward made copies for Miller, Riggs, and Watler. Ward and Riggs reviewed, edited, and corrected it. Watler reviewed it to familiarize himself with the contents of the tapes so that he could advise WFAA on legal questions that might arise. And, Riggs gave a copy of the transcript to the Harmans to review for accuracy.

In late February, Riggs began preparing a memorandum in which he formulated story outlines based on the contents of the tapes and his investigation of those contents.

By the end of that month, the Harmans had provided to WFAA 17 more tapes of the Peavys' conversations. *Id*. Ward listened to, and took notes about, each tape. At Miller's request, Ward prepared a memorandum regarding the persons, and another regarding the topics, mentioned on the tapes.

The 18 tapes WFAA received from Harman contained 188 telephone conversations between the Peavys and others. *Id*. Because the contents of those conversations are *not* particularly relevant to the issues at hand, it is *not* necessary to describe them in detail. Generally, they concern DISD insurance and Peavy's conduct as a DISD trustee, a plan to sell cancer insurance to an entity other than DISD, and Peavy's relationship with Oliver. They also include offensive language, as well as conversations about intensely

6

personal matters which the participants obviously would never have discussed had they known of the interceptions.

By late February 1995, Riggs had been informed by law enforcement sources for another story on which he was working that the Federal Wiretap Act had been amended to cover interception of *cordless* telephone calls. *Id.* Accordingly, he asked Watler to re-check his previous advice regarding the legality of using the intercepted conversations. *Id.* At WFAA's request, Watler conducted further research and discovered that the law had been amended in October 1994 (about six weeks before the first Riggs-Harman meeting), to make it unlawful to intercept the radio portion of a cordless telephone call. *Id.* Pub. L. No. 103-414, § 202(a)(1), 108 Stat. 4290, 4291 (codified as amended at 18 U.S.C. § 2510(1) (deleting from definition of "wire communication" provision which *excluded* radio portion of cordless telephone communication that is transmitted between handset and base unit)).

Watler immediately informed Miller of the amendment and advised WFAA *not* to accept any more tapes. On 1 March, Watler met with Miller and Riggs and advised them his previous advice had been incorrect. He opined that, in any event, the First Amendment took precedence over the wiretapping laws and that WFAA could still use, and broadcast (disclose), the tapes, because it had *lawfully* obtained them. Nevertheless, he advised WFAA that the more conservative approach was *not* to accept additional tapes, *not* to

7

broadcast any tapes, *not* to disclose the contents of the tapes to third parties, and *not* to confront individuals about conversations on the tapes, unless the same information was available from other sources.

In addition, Watler advised WFAA to return the original tapes to Harman and tell him WFAA would *not* accept any more. He also advised WFAA to provide him with all copies of the tapes, transcripts, and other materials related to the tapes' contents.

Ward forwarded the materials (except for her copy of the transcript, which she inadvertently did *not* include) to Watler. The tapes WFAA had received from Harman were returned to him by either Riggs or Ward on or about 1 March. 37 F. Supp. 2d at 504.

Even after learning recording Peavy's conversations was illegal, Harman continued to intercept them until his scanner was seized by the FBI in October 1995. *Id*. Harman told Riggs about the contents of at least one of these interceptions. He also recorded at least one other, for which he pleaded guilty to violating the Federal Wiretap Act and paid a $5,000 fine. *Id*.

At the earlier described 1 March meeting with Miller and Riggs, Watler also advised WFAA could continue to research Peavy and DISD insurance using other means. Riggs and Ward continued their extensive investigation of Peavy and Oliver, such as requesting records from DISD and other governmental agencies; interviewing numerous individuals; investigating DISD's insurance

8

providers; conducting background research and checks on Peavy and others; and reviewing past DISD campaign contributions, board and committee minutes, and insurance proposals.

Between 31 July and 2 August 1995, WFAA broadcast three reports on Peavy's alleged wrongdoing in connection with DISD insurance. *Id*. Although intercepted conversations were *not* played in the broadcasts, the district court held that, in violation of the Federal and Texas Wiretap Acts, WFAA and Riggs "disclosed" portions of the tapes' contents during them. *Id*. at 514. After 2 August, WFAA periodically broadcast follow-up reports on Peavy, Oliver, and DISD insurance. Watler reviewed the broadcasts before they aired.

After Riggs learned of the illegality of the interceptions, he disclosed to federal law enforcement officials and a Dallas Police detective (apparently in August 1995) the tapes' contents and other information from his investigation. Riggs then advised the Harmans about those discussions.

In April 1996, Peavy and Oliver were indicted for bribery and other offenses related to DISD insurance. *Id*. at 504. They were acquitted of all charges. *Id*.

In October 1996, the Peavys filed this action against WFAA and Riggs, claiming violations of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, codified at 18 U.S.C. §§ 2510-2521, as amended by the Electronic Communications Privacy Act

of 1986 (Federal Wiretap Act); as well as making state law claims under TEX. CIV. PRAC. & REM. CODE § 123.001, *et seq.* (Texas Wiretap Act) and for, *inter alia*, civil conspiracy. Separate actions filed by the Olivers against WFAA, Riggs, and Harman, and by the Peavys against the Harmans, were consolidated for pretrial purposes. 37 F. Supp. 2d at 504 n.6.

Cross-motions for summary judgment were referred to the magistrate judge. *Id.* at 502. His October 1998 recommendation was, *inter alia*: WFAA and Riggs violated the Federal and Texas Wiretap Acts by "using" and "disclosing" contents of illegal interceptions, *id*. at 513-15, but they should be awarded summary judgment because liability for their proscribed conduct would violate the First Amendment. *Id*. at 518. Summary judgment was also recommended for WFAA and Riggs on the Peavys' other state law claims. *Id*. at 521-25. The district court adopted the recommendation. *Id*. at 501.

## II.

The Peavys claim the district court erred by: holding defendants did *not* "procure" the interceptions by the Harmans, in violation of the Federal Act, or "obtain" them, in violation of the Texas Act; granting summary judgment against their civil conspiracy claims; applying strict scrutiny and, as a result, holding that the First Amendment shields WFAA and Riggs from liability under the "use" and "disclosure" provisions of the two Wiretap Acts; and

10

denying their motion to suppress the contents of the illegal interceptions.

By cross-appeal, WFAA and Riggs (defendants) contest the holding they engaged in proscribed "use" and "disclosure". Alternatively, they claim the Wiretap Acts are facially unconstitutional for vagueness and overbreadth.

The United States intervened on appeal, pursuant to 28 U.S.C. § 2403(a) and FED. R. APP. P. 44, to defend the constitutionality of the Federal Wiretap Act. And, an amicus brief was filed by numerous media entities, such as the National Broadcasting Company, Inc.

We review the summary judgment *de novo*, using "the same criteria as the district court, viewing all facts, and the inferences to be drawn from them, in the light most favorable to the non-movants". **Forsyth v. Barr**, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871 (1994). The judgment is proper if, in the light of the summary judgment record, "'there is no genuine issue as to any material fact and ... the mov[ant] is entitled to a judgment as a matter of law.'" **Id**. (quoting FED. R. CIV. P. 56(c)).

"[T]he substantive law will identify which facts are material". **Anderson v. Liberty Lobby, Inc.**, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude ... summary

11

judgment." *Id.* "[A] dispute about a material fact is 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmov[ant]". *Id.*

## A.

The Federal Wiretap Act is violated if a person, *inter alia*, "*procures any other person* to intercept ... any wire, oral, or electronic communication". 18 U.S.C. § 2511(1)(a) (emphasis added). Under the Texas Wiretap Act, "[a] party to a communication may sue a person who ... [, *inter alia,*] *obtains another* to intercept ... the communication". TEX. CIV. PRAC. & REM. CODE § 123.002(a)(1) (emphasis added).

The district court held defendants neither "procured", in violation of the Federal Act, nor "obtained", in violation of the Texas Act, the Harmans to intercept the Peavys' communications, because the Harmans made an independent decision in which defendants did *not* actively participate. *Peavy*, 37 F. Supp. 2d at 512-13.

## 1.

Defendants urge us to affirm the summary judgment on the ground, *not* addressed by the district court, that the Peavys did *not* timely plead a "procures" or "obtains" claim. They maintain the former was *not* raised until in opposition to summary judgment; the latter, until in objections to the recommendation.

12

"A pleading which sets forth a claim for relief ... shall contain ... a short and plain statement of the claim showing that the pleader is entitled to relief". FED. R. CIV. P. 8(a). "The form of the complaint is not significant if it alleges facts upon which relief can be granted, even if it fails to categorize correctly the legal theory giving rise to the claim." *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 604 (5th Cir. 1981).

The amended complaint stated, *inter alia*, that defendants conspired *with the Harmans* "to intercept" the Peavys' communications, "knowing or having reason to know" the contents were obtained through interception in violation of, *inter alia*, "18 U.S.C. § 2511 and/or Chap. 123, TEX. CIV. PRAC. & REM. CODE". "Procuring" and "obtaining" claims are stated.

2.

Alternatively, for the federal "procures" claim, defendants urge affirming summary judgment on the ground there is *no* private civil action for violation of that portion of § 2511(1)(a).

a.

The Peavys contend, incorrectly, that defendants "waived" this issue by *not* presenting it in district court. Although the magistrate judge and district judge did *not* address this no-civil-action issue, defendants did raise it in response to the Peavys' objections to the recommendation.

13

Even assuming the issue was *not* properly raised, we may consider a "purely legal claim" advanced for the first time on appeal, to support affirmance of a summary judgment, when "there are no countervailing reasons warranting remand to the district court". *See **F.D.I.C. v. Lee***, 130 F.3d 1139, 1141-43 (5th Cir. 1997) (affirming summary judgment on statutory ground raised by appellee for first time on appeal).

Whether the Federal Act authorizes a private civil action for procurement is a legal issue of statutory interpretation, which requires *no* presentation of evidence. Because the issue has been fully briefed, and the Peavys *cannot* claim prejudice, there are *no* "countervailing reasons" to preclude our considering it.

b.

Defendants did *not* cite, nor have we found, any cases addressing the availability, under the Federal Act, of a civil procurement action. Prior to its amendment in 1986, the provision authorizing civil damages stated, in pertinent part:

> Any person whose wire or oral communication is intercepted, disclosed, or used in violation of this chapter shall (1) have a civil cause of action against any person who intercepts, discloses, or uses, *or procures any other person to intercept, disclose, or use such communications*, and (2) be entitled to recover from any such person [damages, attorney's fees, and costs].

18 U.S.C. § 2520 (1970) (emphasis added).

14

But, the "or procures any other person" language was deleted when the section was amended in 1986. *See* **Oceanic Cablevision, Inc. v. M.D. Elecs.,** 771 F. Supp. 1019, 1027 (D. Neb. 1991) ("[s]ection 103 of the Electronic Communications Privacy Act of 1986[] amended § 2520 by eliminating the 'or procures another person' language of the statute and incorporating violations involving the interception, disclosure, or intentional use of electronic communications" (citing S. Rep. No. 541, 99th Cong., 2d Sess. 26-27, *reprinted in* 1986 U.S.C.C.A.N. 3555, 3580-81)).

As amended, § 2520 provides, in pertinent part, that

> any person whose wire, oral, or electronic communication is *intercepted, disclosed, or intentionally used* in violation of this chapter may in a civil action recover from the *person or entity which engaged in that violation* such relief as may be appropriate.

18 U.S.C. § 2520(a) (Supp. 2000) (emphasis added). Nevertheless, § 2511(1)(a) continues to proscribe procuring another to intercept covered communications.

In short, the class of persons who may bring a civil action for violation of the Act is the same in both the original and amended provisions: those with covered communications "intercepted, disclosed, or used" in violation of the Act. But, those who may be held civilly liable are *not* the same. The amended provision does *not* have the "procures any other person" language, extending civil liability to "the person or entity which engaged in *that violation*", 18 U.S.C. § 2520(a) (Supp. 2000) (emphasis added).

15

And, the referenced "violation" is "intercepted, disclosed, or intentionally used"; there is *no* mention of "procures".

"When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect." *Stone v. I.N.S.*, 514 U.S. 386, 397 (1995). The Peavys counter that the amendment did *not* take away an action for procurement, because the § 2520(a) class of potential defendants is broad enough to cover persons who violate the Federal Act by procuring another to intercept; and the legislative history of the amendment does *not* indicate any intent to eliminate a civil claim for procurement.

We disagree. Section 2520(a)'s plain, unambiguous language authorizes a civil action by one whose covered "communication is *intercepted, disclosed, or intentionally used in violation of this chapter*", from "the person or entity *which engaged in that violation*". 18 U.S.C. § 2520(a) (Supp. 2000) (emphasis added). "Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985). Restated, we must assume Congress meant what it said in the amendment. Accordingly, "that violation" refers only to illegal interception, disclosure, or use, and *not* to procuring interception by another.

This interpretation of § 2520(a) does *not* render superfluous the portion of § 2511(1)(a) prohibiting "procuring"; as noted, that proscription can be enforced through, *inter alia*, a criminal proceeding. *See **BFP v. Resolution Trust Corp.***, 511 U.S. 531, 537 (1994) ("it is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another" (brackets, internal quotation marks, and citation omitted)).

Because the plain language of the statute is unambiguous, resort to legislative history for its interpretation is *not* necessary. *See **Andrews & Kurth L.L.P. v. Family Snacks, Inc. (Matter of Pro-Snax Distribs., Inc.)***, 157 F.3d 414, 425 (5th Cir. 1998). Moreover, even if the legislative history is silent regarding Congress' intent, in the 1986 amendment, to take away a civil action for procurement, that silence does *not* make the amended statute ambiguous. If Congress intended to retain the action, it failed to express that intent. *See **id***. (where language in statute was deleted in amendment, absence of legislative history did *not* render statute ambiguous; even if Congress intended to leave language intact, such intent was *not* reflected in unambiguous, amended statute).

Obviously, if Congress did *not* intend to delete a civil procurement action, it can amend § 2520(a). But, it goes without

17

saying that we *cannot* do so. The federal procurement claim was properly dismissed.

c.

But, even though there is *no* federal civil liability for "procurement", such activity, as noted, is nevertheless unlawful, pursuant to § 2511(1)(a). Accordingly, it may well be that procurement *vel non* remains an issue for trial. For example, for damages purposes, procurement *vel non* may bear on the extent of defendants' knowledge of the Harmans' illegal interceptions.

The following section concerning the Peavys' "obtains" claim under the Texas Act is intertwined with procurement *vel non* under the Federal Act. For the reasons stated in that section, we hold, contrary to the district court, that there *is* a material fact issue on procurement.

3.

For the Texas Act, the Peavys contend they are entitled to judgment as a matter of law, or, in the alternative, there is at least a material fact issue, on whether defendants "obtained" the Harmans' interception of the Peavys' conversations, by encouraging them to intercept calls, instructing them on recording techniques, requesting and picking up tapes of recorded conversations from them, and promising to expose Peavy's wrongdoing. Defendants respond that their association with the Harmans and receipt of the

18

tapes does *not* constitute "obtaining" the Harmans to make the interceptions.

a.

The Texas Act does *not* define "obtains"; similarly, the parties did *not* cite, nor did we find, any Texas cases interpreting that term for purposes of the Act. The parties' briefs focus primarily on federal "procurement". According to the Peavys, "obtain" has essentially the same meaning as "procure". Defendants apparently agree: they maintain the evidence and authorities cited in their discussion of the federal procurement claim also demonstrate they did *not* "obtain" the Harmans' interceptions in violation of the Texas Act.

The Peavys cite the BLACK'S LAW DICTIONARY definition of "obtain": "to get hold of by effort; to get possession of; *to procure*; to acquire, in any way". BLACK'S LAW DICTIONARY 1228 (rev. 4th ed., West 1968) (emphasis added). The Seventh Edition of BLACK'S contains *no* definition of the term. Webster defines it as "to gain or attain possession or disposal of usu[ally] by some planned action or method" or "to bring about or call into being". WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (UNABRIDGED) 1559 (1986). *See also* THE NEW SHORTER OXFORD ENGLISH DICTIONARY 1970 (1993) ("Come into the possession or enjoyment of; secure or gain as the result of request or effort; acquire, get.").

19

The Texas Court of Appeals has stated: "In the absence of a statutory definition, statutory language is measured by common understanding and practices". *Reeves v. State*, 969 S.W.2d 471, 487 (Tex. App. — Waco 1998), *cert. denied*, ___ U.S. ___, 119 S. Ct. 1462 (1999); *see also Carroll v. State*, 911 S.W.2d 210, 220 (Tex. App. — Austin 1995) ("[i]n the absence of special definitions, statutory language can be measured by common understanding and practices or construed in the sense generally understood").

*Carroll*, 911 S.W.2d at 220, relied on dictionary definitions of "obtain" when construing the Texas statutory exclusionary rule, TEX. CODE CRIM. P. ANN. art. 38.23(a) (prohibiting admission at trial against accused in criminal case of evidence "*obtained*" in violation of federal or Texas law (emphasis added)). *See Reeves*, 969 S.W.2d at 487 (construing art. 38.23 and stating that "'obtain' means to gain or attain by planned action or effort" (citing *State v. Daugherty*, 931 S.W.2d 268, 270-71 (Tex. Crim. App. 1996))); *Ferguson v. State*, 699 S.W.2d 381, 386 (Tex. App. — Fort Worth 1985) (citing dictionary definitions in concluding that, although robbery statute uses term "obtain", trial court's use of terms "appropriate" and "acquire", rather than "obtain", in jury charge was *not* error).

The Peavys contend "obtain" does *not* require any "active participation" in the interception, but only knowing participation in the overall scheme by which the communications were intercepted.

20

They maintain it is enough to knowingly condone another's interceptions and advise him concerning them; or to implicitly encourage the interception by using the information for the interceptor's benefit.

In this regard, they urge applying the definition of aiding and abetting applied by the Supreme Court in **Nye & Nissen v. United States**, 336 U.S. 613 (1949), cited in the legislative history of the Federal Wiretap Act.  *See* S. Rep. No. 90-1097, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.C.C.A.N. 2112, 2181.  In **Nye**, "aid and abet" was defined to mean "that a defendant in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed".  **Id**. at 619 (internal quotation marks and citation omitted).

Defendants respond that the Federal Act's legislative history does *not* discuss or cite any particular language in **Nye** with approval, and does *not* equate "procure" with "aid and abet".  They urge that "procure" (and, presumably, "obtain" for Texas Act purposes) means "actively bringing about, causing or instigating something to be done".  Alternatively, they claim that, under the definition relied on by the Peavys, their conduct does *not* constitute "aiding and abetting" the interceptions.

Defendants assert there is *no* evidence they caused, instigated, or enlisted Harman to make the interceptions, or

21

participated in, or encouraged, them.  They note his interceptions started before Riggs contacted them, and continued after they stopped accepting tapes from him.

The summary judgment record contains the following evidence pertinent to this "obtains", as well as the "procures", claim.  The Harmans acquired the scanner and, prior to contacting WFAA or meeting with Riggs, began intercepting and recording the Peavys' telephone conversations.  Defendants never provided Harman with equipment to assist in that.

The Harmans called WFAA and met with Riggs, because they were frustrated with the lack of action by law enforcement authorities to whom they had reported Peavy's conduct, and wanted it investigated and exposed.

When the Harmans asked Riggs whether he wanted a copy of the tape listened to at their initial meeting, and any future tapes they might make, he replied that he did.  Riggs instructed Harman *not* to turn the recorder on and off while listening to the intercepted conversations, and *not* to edit the tapes, to prevent authenticity challenges.

As the Harmans made additional tapes, they called Riggs and told him.  Occasionally, he telephoned the Harmans to ask if additional tapes were available.  Riggs testified in his deposition:  he was very interested in obtaining any additional

22

information to further his investigation of Peavy; and he asked Harman to keep him aware of whatever else he was hearing.

Either Riggs or Ward picked up the tapes from the Harmans. Harman testified in his deposition: when Riggs came to pick up tapes, he would listen to them at the Harmans' home; he told Harman he would "look into" the contents of the tapes; and later told Harman he was "finding more stuff" based on such contents.

According to Mrs. Harman, Riggs and Harman, after their initial meeting, had "a lot" of telephone conversations. After the Harmans learned recording the conversations was illegal and WFAA informed them it would *not* accept additional tapes, they continued intercepting the Peavys' conversations, and continued telephone contact with Riggs. Riggs also met with the Harmans in their home after they learned of the illegality.

On 1 March 1995, after Watler told Riggs, Miller, and Ward they could *not* accept additional tapes, Riggs called Harman and recorded their conversation, without Harman's knowledge. In that conversation, Riggs discussed the progress defendants had made on the story and assured Harman repeatedly that he and WFAA were going to continue working on the story.

Viewing this evidence in the light most favorable to the Peavys, we conclude that, although they are *not* entitled to summary judgment on this point, neither are defendants. Construing "obtains" in the sense generally understood (gain or attain by

23

planned action or effort), a reasonable jury *could* find that, with the exception of the interceptions made by the Harmans *prior* to their contacting WFAA and Riggs, and possibly the interceptions made *after* Riggs informed Harman that WFAA would *not* accept additional tapes, defendants' interim conduct constituted "obtaining" the Harmans to intercept the Peavys' conversations, in violation of the Texas Act (as well as "procuring" them in violation of the Federal Act).

At the very least, to the extent Riggs' instructions regarding recording entire conversations caused the Harmans to intercept and record portions of conversations they otherwise would *not* have intercepted and recorded, a reasonable jury could conclude Riggs "obtained" (or "procured") the Harmans' interception of those discrete portions.

A reasonable jury also could conclude that defendants' willingness to pursue the investigation and exposure of Peavy's alleged wrongdoing — the purpose for which the Harmans contacted WFAA — encouraged the Harmans to continue intercepting, and recording, the Peavys' conversations, even if it was *not* the sole motivation for their doing so.

b.

Another of defendants' assertions about federal "procurement" appears to bear on the Peavys' Texas "obtains" claim. In a footnote to their contention there is *no* "procurement" action,

24

defendants conclusorily assert: "if procurement is construed as broadly as [the Peavys] would have it, the ... provision also would be unconstitutional as applied ... and on its face". They cross-reference their contentions that the First Amendment shields them from liability for proscribed "use" and "disclosure".

Obviously, assuming defendants intend this to apply to the "obtains" claim, it is *not* adequately briefed. In any event, it is without merit. Defendants have essentially conceded the First Amendment would *not* bar an action against them for interception. There is *no* basis for distinguishing, for First Amendment purposes, between a person intercepting, on the one hand, and *obtaining* it through someone else, on the other.

B.

For their state law civil conspiracy claim, and relying on the same evidence supporting their "obtains" claim, the Peavys contend they are entitled to summary judgment, or, in the alternative, there is at least a material fact issue whether defendants conspired with the Harmans to intercept the conversations. Summary judgment was granted defendants on the ground there was *no* evidence of conspiracy — that defendants believed in good faith their activities were lawful. *Peavy*, 37 F. Supp. 2d at 524-25.

1.

The Peavys contend ignorance or mistake of law is *not* a defense to civil conspiracy, so it is irrelevant whether defendants

25

knew their actions violated the Texas Act.  Defendants counter that, because civil conspiracy requires proof of specific intent, the Peavys must prove:  (1) Riggs knew his conduct was unlawful (they claim undisputed evidence establishes the contrary); and (2) Riggs entered into an agreement specifically intending to injure the Peavys (they claim there is *no* evidence of such an agreement).

Civil conspiracy under Texas law is "a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means". ***Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.***, 435 S.W.2d 854, 856 (Tex. 1968) (internal quotation marks and citations omitted).  "The essential elements are:  (1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result". ***Massey v. Armco Steel Co.***, 652 S.W.2d 932, 934 (Tex. 1983).  *Not* at issue are the first, fourth, and fifth elements.

In Texas, "civil conspiracy requires specific intent". ***Triplex Communications, Inc. v. Riley***, 900 S.W.2d 716, 719 (Tex. 1995).  Proof that a defendant "intend[ed] to engage in the conduct that resulted in the injury" is insufficient. ***Id***.  Instead, "[f]or a civil conspiracy to arise, the parties must be aware of the harm or wrongful conduct at the inception of the combination or agreement". ***Id***.  "One without knowledge of the object and purpose

26

of a conspiracy cannot be a co-conspirator; he cannot agree, either expressly or tacitly, to the commission of a wrong which he knows not of". *Schlumberger*, 435 S.W.2d at 856. "And, of course, one without knowledge of a conspiratorial plan or scheme to injure another by the commission of a particular wrong cannot share the intent to injure such other". *Id*. at 857.

Based on the evidence discussed *supra*, a reasonable jury *could* find that defendants and the Harmans agreed to accomplish a *lawful purpose* (investigation and exposure of Peavy's alleged wrongdoing), but undertook to do so, at least in part, by *unlawful means* (proscribed interception, use, and disclosure of Peavys' conversations). It is undisputed that, from the inception of their association, Riggs knew the Harmans had intercepted and recorded the Peavys' conversations without the knowledge of any of the parties to them.

Thus, defendants were aware of the Harmans' wrongful *conduct*. None of the cases cited by defendants supports their contention that Texas law requires additional proof they knew about the provisions that made such conduct illegal. Moreover, *Glenn H. McCarthy, Inc. v. Knox*, 186 S.W.2d 832, 838 (Tex. App. – Galveston 1945), rejects such a contention:

> Though defendants did not know of the illegality of the agreement, the purpose of the conspiracy is to be determined ordinarily by the quality of the acts to be performed under it.... It is therefore not a necessary

27

> element that a party have knowledge of the illegality of the end which would be accomplished thereby.

*Id*. at 838.

Once again, while the Peavys are *not* entitled to summary judgment on this claim, neither are defendants. A reasonable jury *could* find the requisite "meeting of the minds" based on the following evidence: Riggs, knowing the circumstances under which the calls were intercepted, agreed to accept, from the Harmans, tapes of the interceptions and conduct an investigation of the contents in an effort to expose Peavy's alleged wrongdoing, which Harman admitted was the purpose for his contacting WFAA and meeting with Riggs; and Riggs instructed Harman to record entire conversations, and to *not* edit tapes.

## 2.

Alternatively, defendants contend conspiracy liability would violate their First Amendment protections. This contention is inadequately briefed. In any event, we reject it for the same reasons we rejected their contention that the First Amendment precludes holding them liable, under the Texas Act, for "obtaining" the interceptions.

## C.

Defendants' cross-appeal challenges the holding they violated the "use" and "disclosure" provisions of the Federal and Texas Acts. They maintain they are entitled to summary judgment on this

28

issue, or, in the alternative, that there is a material fact issue, precluding judgment as a matter of law on this point for the Peavys.

This issue is addressed prior to considering the presented First Amendment issues because, obviously, we need *not* reach them if defendants did *not* violate these provisions. *See, e.g., **County Court of Ulster County, N.Y. v. Allen***, 442 U.S. 140, 154 (1979) (court has "strong duty to avoid constitutional issues that need not be resolved in order to determine the rights of the parties to the case under consideration").

The Federal Act permits a civil action against "any person" who "intentionally" discloses to another person or uses "the contents of any [covered] communication, knowing or having reason to know that the information was obtained through the interception of [a covered] communication in violation of this subsection". 18 U.S.C. § 2511(1)(c) and (d). The Act defines "contents" as including "any information concerning the substance, purport, or meaning of that ... communication". 18 U.S.C. § 2510(8). Similarly, the Texas Act provides: "A party to a communication may sue a person who ... *uses* or *divulges* information that he knows or reasonably should know was obtained by interception of the communication". TEX. CIV. PRAC. & REM. CODE § 123.002(a)(2) (emphasis added). For our purposes, "disclose" under the Federal Act and "divulge" under the Texas Act are considered equivalent.

29

The district court held defendants violated the Acts by "using" the contents of the illegally intercepted conversations to analyze, compile, make notes, and develop leads; and by "disclosing" those contents in their television broadcasts *and* to other persons. *Peavy*, 37 F. Supp. 2d at 514-15. On a multitude of grounds, defendants challenge these "used-and-disclosed" conclusions.

1.

a.

First, defendants contend that, in their television broadcasts, they did *not* use or disclose the tapes' contents, because the broadcasts were based entirely on sources independent of the tapes, and those sources "attenuated" the taint of the interceptions. Defendants maintain they should *not* be forever barred from investigating all topics discussed in the intercepted conversations merely because they first learned of those topics as a result of the interceptions.

The "attenuation doctrine" was developed in Fourth Amendment jurisprudence, for criminal cases, as an exception to the exclusionary rule. *See Wong Sun v. United States*, 371 U.S. 471, 485-88 (1963). That rule generally prohibits admission of evidence obtained "during or as a direct result" of a search or seizure in violation of the Fourth Amendment. *Id*. at 485. But, under the attenuation doctrine, such evidence may be admissible if "the

30

connection between the lawless conduct of the police and the discovery of the challenged evidence has become so attenuated as to dissipate the taint". *United States v. Ceccolini*, 435 U.S. 268, 274 (1978) (internal quotation marks and citation omitted).

In correctly rejecting defendants' reliance on this doctrine, the district court stated:  "The fact that Riggs later obtained the same information from independent sources" was irrelevant, *Peavy*, 37 F. Supp. 2d at 514, because "the exclusionary rule does not excuse a substantive violation of the law".  *Id*. at 514 n.17.

Defendants' reliance on cases addressing the suppression of wiretap evidence under the Federal Act exclusionary rule, § 2515 (if communication intercepted, contents and evidence derived therefrom may *not* be received in evidence if such disclosure would violate Act), is misplaced in the context of whether defendants are liable for "use" and "disclosure".  *E.g.*, *United States v. Smith*, 155 F.3d 1051, 1059-63 (9th Cir. 1998) (applying attenuation doctrine in resolving § 2515 suppression issue), *cert. denied*, 525 U.S. 1071 (1999); *United States v. Baranek*, 903 F.2d 1068, 1072 (6th Cir. 1990) (applying Fourth Amendment principles to resolve § 2515 suppression issues).

b.

We reject Defendants' claim that their television broadcasts did *not* constitute "disclosure" because much of the information in them was provided a week earlier in a television broadcast by

31

another station.  Defendants' broadcasts included substantial information *not* broadcast by the other station.  For example, the other broadcast did *not* refer to Peavy's plan to sell insurance to an entity other than DISD.  Moreover, this contention is inconsistent with defendants' television broadcasts, which frequently touted the exclusivity of their reporting and investigation.

## c.

Nevertheless, we conclude there is a material fact issue whether, in their television broadcasts, defendants intentionally *disclosed* the contents of the illegal interceptions.  As discussed *infra*, this is independent of "use" liability.

Defendants did *not* play interception-tapes in their television broadcasts.  Although the record contains considerable evidence that their entire investigation of Peavy and DISD insurance would *not* have occurred but for those tapes, and that some of the topics covered in their broadcasts were initially derived from them, that evidence is *not* uncontradicted.  There is also considerable evidence of their extensive investigation, and their reliance on sources independent of the intercepted contents for the material reported in those broadcasts.

Therefore, a reasonable jury *could* conclude that, *in their television broadcasts*, defendants did *not* intentionally *disclose*

32

the intercepted contents, but instead disclosed information obtained from sources independent of them.

Again, this point concerns *only* whether, *in their television broadcasts*, defendants *intentionally disclosed* intercepted contents, *not* whether they *used* the contents in their investigation or otherwise made other types of *disclosures* of those contents. As discussed *infra*, the Wiretap Acts restrict the publication of information based solely on the means by which it was acquired. Accordingly, the Acts do *not* prohibit *disclosure* of information that might be contained in illegal interceptions, *so long as* such disclosed information is acquired by *other, non-prohibited means*.

Therefore, if a jury finds defendants' television broadcasts reported information obtained from sources independent of the tapes, defendants would *not* be liable, under the Wiretap Acts, for *disclosing* such information in their television broadcasts, *even if* the information so disclosed was also included in the contents of those intercepted communications.

This distinction between "use" and "disclosure" gives effect to both provisions, and does *not* undermine their purposes. Prohibiting liability for *disclosure*, where it is based on sources independent of interceptions, does *not* create a market for the contents of interceptions. This is because, as noted, the person making such disclosure still remains subject to punishment under

33

the Acts' "use" provisions, if, for example, the intercepted communications are *used* to obtain such independent sources.

Accordingly, the district court erred in holding *as a matter of law* that, in their television broadcasts, defendants intentionally *disclosed* the contents of the Peavys' conversations.

2.

Regarding defendants' "use", as well as their "disclosure" by means other than through a television broadcast, defendants claim, on five bases, exceptions, as a matter of law, to liability: (a) newsgathering; (b) internal disclosure to corporate agents; (c) common-interest privilege; (d) disclosure to attorney for legal advice; and (e) disclosure to law enforcement officials.

a.

Defendants maintain "use" and "disclosure", during their investigation and newsgathering, is *not* proscribed. They do *not* deny that they used and, in a non-broadcast context, disclosed the contents of the interceptions. Instead, they assert the court's broad interpretations of "use" and "disclosure" seriously jeopardize vital First Amendment interests; and, to preserve them, we should construe the terms narrowly and conclude that exploring leads from *lawfully obtained* information is *not* proscribed "use" or "disclosure".

The only case cited in support is **United States v. Smith**: "A lead ... is simply not enough to taint an entire investigation".

34

155 F.3d at 1063. As discussed *supra*, **Smith** is a criminal case in which Fourth Amendment principles were applied in discussing suppression under § 2515, the statutory exclusionary rule. It offers *no* support for defendants' narrow construction of "use" and "disclosure". Defendants' First Amendment contentions are addressed *infra*.

b.

Defendants contend disclosures to WFAA employees of the contents of the interceptions are *not* actionable because a corporation cannot disclose information to itself. They maintain this principle also applies to disclosures to their attorney, Watler, and to the person who transcribed portions of the interceptions, because both acted as WFAA's agents.

Defendants cite *no* authority for holding intra-organization disclosures are *not* violative of the Wiretap Acts. The Acts authorize certain specified disclosures. Such exceptions do *not* include the types made by defendants. *See* 18 U.S.C. § 2517(1) (authorizing disclosure by "[a]ny investigative or law enforcement officer who, by any means authorized by this chapter, has obtained knowledge of the contents of any [covered] communication or evidence derived therefrom" to "another investigative or law enforcement officer to the extent that such disclosure is appropriate to the proper performance of the official duties of the officer making or receiving the disclosure"); 18 U.S.C. § 2517(3)

35

(authorizing disclosure by "[a]ny person who has received, by any means authorized by this chapter, any information concerning a [covered] communication, or evidence derived therefrom intercepted in accordance with the provisions of this chapter ... while giving testimony under oath or affirmation in any proceeding held under the authority of the United States or of any State or political subdivision thereof"); TEX. CIV. PRAC. & REM. CODE § 123.003(a) (authorizing disclosure by "switchboard operator or an officer, employee, or agent of a communication common carrier whose facilities are used in the transmission of a wire communication ... in the normal course of employment if engaged in an activity that is necessary to service or for the protection of the carrier's rights or property").

Accordingly, such use and disclosure, during defendants' investigation and newsgathering, are proscribed by the Federal and Texas Acts.

c.

Defendants also maintain disclosures to WFAA employees and agents are protected by a "common interest" privilege. That privilege, applicable in defamation cases, "attaches to statements which occur under circumstances wherein any one of several persons having a common interest in a particular subject matter may reasonably believe that facts exist which another, sharing that common interest, is entitled to know". *Gaines v. CUNA Mut. Ins.*

36

*Soc'y*, 681 F.2d 982, 986 (5th Cir. 1982) (citing case applying Texas law).

Defendants acknowledge, however, that this privilege has *not* been applied in cases involving the Wiretap Acts. This issue, raised in a footnote, is *not* adequately briefed. In any event, for purposes of this case, the privilege is *not* available. Neither Act authorizes disclosure in such circumstances. *See* 18 U.S.C. § 2517(1) and (3); TEX. CIV. PRAC. & REM. CODE § 123.003(a).

d.

Defendants contend that disclosure to their attorney, Watler, is *not* actionable, because they consulted him for legal advice. They rely on *Nix v. O'Malley*, 160 F.3d 343 (6th Cir. 1998), which recognized an implied "defense exception" to disclosure liability, pursuant to which the defendant had a privilege to disclose contents of an interception to his attorneys "to assist in the defense of the claims made against him". *Id*. at 351 (internal quotation marks omitted). The Sixth Circuit cited with approval *McQuade v. Michael Gassner Mechanical & Elec. Contractors, Inc.*, 587 F. Supp. 1183 (D. Conn. 1984), in which that court stated:

> To deny defendants' counsel any possibility of investigating or rebutting the allegations on which [a] claim for punitive damages is based, or of discussing the contents of the tapes with their clients in the course of preparing a defense of [a] lawsuit, would be to convert the allegations of the complaint into a judgment.

37

587 F. Supp. at 1190.

Defendants' reliance on these cases is misplaced; their "disclosures" to Watler were *not* made for the purpose of defending against Wiretap Act claims. Instead, they were made after he advised them (erroneously) that the Federal Act did *not* apply to cordless telephone communications.

There was *no* need for defendants to make the "disclosures" to Watler in order to obtain his legal advice on whether the Wiretap Acts proscribed such interception. And, there is *no* evidence that, at that time, defendants or Watler contemplated the possibility of civil actions against defendants under the Federal or Texas Acts. In fact, the record does *not* indicate Watler was even aware of the existence of the Texas Act; it does *not* reflect that he ever advised defendants about it.

e.

(1)

Defendants claim Riggs' "disclosures" to federal law enforcement authorities and the Dallas Police Department do *not* provide a basis for liability because those agents were already aware of the contents of the communications at the time Riggs discussed his investigation with them. The record does *not* support this contention.

In his deposition, Riggs admitted that ATF Agent Curtiss did *not* already know about the tapes before Riggs described their

38

contents to him.  And, he testified that, prior to their conversation, Dallas Police Detective Storey, to whom he also disclosed the contents of the communications, did *not* seem to know about them.

(2)

Alternatively, defendants contend Riggs' "disclosures" to law enforcement officials were protected by a qualified privilege to report crimes.  As stated *supra*, the Federal and Texas Acts authorize "disclosure" only in specified, limited circumstances, none of which include the "disclosures" made by Riggs.

In **Rodgers v. Wood**, 910 F.2d 444 (7th Cir. 1990), the court rejected a similar privilege claim, holding that the Federal Act provides "no support for recognizing [an] exception for the common law privileges protecting statements made to law enforcement agents in furtherance of criminal investigations".  **Id**. at 447.

> The very nature of the Act is to impose limitations on the effectiveness of law enforcement agents in the interests of protecting the privacy of citizens....  The Act represents Congress's careful balancing between the interests of the enforcement of criminal laws and the assurance of privacy in oral and wire communications.  To recognize a common law privilege as [defendant] suggests would upset that balance.

*Id*.

3.

The Federal Act prohibits "intentionally" using or disclosing the contents of covered communications, "*knowing or having reason*

39

*to know* that the information was obtained through the interception" of such a communication in violation of the Act. 18 U.S.C. § 2511(1)(c) and (d) (emphasis added). Under the Texas Act, "a person who ... uses or divulges information that he *knows or reasonably should know* was obtained by interception of the communication" may be civilly liable. TEX. CIV. PRAC. & REM. CODE § 123.002(2) (emphasis added).

Defendants assert that, in their "uses" and "disclosures", they did *not* act "intentionally", as required for liability, because, in good faith reliance on the advice of law enforcement officials and legal counsel, they did *not* know, or have reason to know, the conversations were intercepted illegally. They insist they are *not* claiming "mistake of law", in which a defendant asserts that his subjective, good faith belief in the lawfulness of his conduct excuses a violation of the law. Instead, they contend their state of mind as to the legality of their conduct bears directly on whether they acted "intentionally".

The district court rejected that contention, relying on our court's having "implicitly rejected a good faith defense", **Peavy**, 37 F. Supp. 2d at 511, in **Forsyth**, 19 F.3d at 1538 n.21 (*knowledge element* for use and disclosure liability requires proof defendant knew "1) the information used or disclosed came from an intercepted communication, and 2) sufficient facts concerning the circumstances of the interception such that the defendant could, with presumed

40

knowledge of the law, determine that the interception was prohibited in light of [the Act]" (quoting **Thompson v. Dulaney**, 970 F.2d 744, 749 (10th Cir. 1992))). **Peavy**, 37 F. Supp. 2d at 511.

Defendants rely on **United States v. Schilleci**, 545 F.2d 519 (5th Cir. 1977), to support their contention that the Federal Act requires proof of specific intent: that defendants acted intentionally with the knowledge their conduct violated the Act. But, as the district court noted, the criminal defendant in **Schilleci** was charged with *conspiracy* to intercept wire and oral communications; and conspiracy is a specific intent crime. **Peavy**, 37 F. Supp. at 511 n.14.

It is undisputed defendants knew that the information they used and disclosed came from interceptions. It is also undisputed they were aware of sufficient facts concerning the circumstances of those interceptions such that they could, with presumed knowledge of the law, determine the interceptions were prohibited by law. Defendants contend, however, that the presumption they acted with knowledge of the law was overcome by proof of erroneous legal advice and reasonable reliance on the Harmans' statements that law enforcement officials had told them the interception and recording were legal. They maintain such reliance negates the mental state required for liability.

Despite their insistence to the contrary, acceptance of defendants' contentions would constitute recognition of an

ignorance or mistake of law defense to Federal and Texas Wiretap Act liability. As the district court noted, our court, at least implicitly, rejected such a defense in *Forsyth*; and it has been rejected by numerous other courts. *E.g., Reynolds v. Spears*, 93 F.3d 428, 435-36 (8th Cir. 1996) (defendant's reliance on incorrect advice from law enforcement officer *not* defense to liability under Federal Act); *Williams v. Poulos*, 11 F.3d 271, 285 (1st Cir. 1993) (rejecting good faith defense where defendant mistakenly believed use and disclosure authorized by statute); *Thompson v. Dulaney*, 970 F.2d 744, 749 (10th Cir. 1992) ("defendant may be presumed to know the law"); *Heggy v. Heggy*, 944 F.2d 1537, 1541 (10th Cir. 1991) (rejecting "good faith" defense to Federal Act liability based upon mistake of law), *cert. denied*, 503 U.S. 951 (1992); *United States v. McIntyre*, 582 F.2d 1221, 1224-25 (9th Cir. 1978) (rejecting contention interception *not* "willful" because defendants believed in good faith, based on advice from a law enforcement communications technician, that their conduct was legitimate).

We join those courts and reject an ignorance or mistake of law defense for disclosure or other use of communications illegally intercepted in violation of § 2511(1)(c) and (d) of the Federal Act and § 123.002(2) of the Texas Act. Based on the existence of the Acts and their knowledge of the circumstances of the Harmans' interception, defendants, at a minimum, had *reason to know* the

42

interceptions were illegal.  They used and disclosed the contents of those interceptions purposefully, *not* inadvertently.

4.

Remaining are three "use" and "disclosure" issues:  two raised by defendants; one, by the Peavys.  We do *not* consider any of them, because they were *not* raised in the parties' opening briefs.  *E.g.*, **United States v. Jackson**, 50 F.3d 1335, 1340 n.7 (5th Cir. 1995) ("It is well-settled that, generally, we will not consider issues raised for the first time in a reply brief.").

Defendants contend, for the first time in their reply brief, that "use" and "disclosure" damages are *not* permissible without proof of actual malice under the standard from **New York Times Co. v. Sullivan**, 376 U.S. 254, 279-80 (1964); and that, because the majority of the Peavys' "use" and "disclosure" allegations were untimely, we should reverse the district court's "use" and "disclosure" holding.  (Moreover, the untimeliness issue is *not* adequately briefed.  And, assuming it has any validity, it would seem to be a matter for the district court's consideration for trial.)

Likewise, in their brief as cross-appellees, rather than in their opening brief, the Peavys challenge the district court's holding that listening to tapes, and reading transcripts, of interceptions was *not* a prohibited "use".  (Moreover, as cross-appellees on this issue, they *cannot* seek to enlarge their rights

43

under the district court's decision. *See **Laker v. Vallette (Matter of Toyota of Jefferson, Inc.)***, 14 F.3d 1088, 1090 n.1 (5th Cir. 1994).)

                                    D.

Despite holding that defendants "used" and "disclosed" the interceptions in violation of the Wiretap Acts, based, in part, on concluding, as required by the Acts, that defendants *knew, or had reason to know*, the interceptions were in violation of the Acts, the district court nevertheless granted summary judgment for defendants on the use and disclosure claims, on the ground that imposition of liability would violate the First Amendment. ***Peavy***, 37 F. Supp. 2d at 515-18. In so doing, it applied the strict scrutiny analysis from ***The Florida Star v. B.J.F.***, 491 U.S. 524, 533 (1989). ***Peavy***, 37 F. Supp. 2d at 515-16.

One of the key bases underlying this First Amendment holding was the court's conclusion that, although the Harmans intercepted illegally, defendants nevertheless "lawfully obtained" the contents of those interceptions because they neither participated in them nor *procured/obtained* the Harmans to do so. ***Id***. at 516-17. Therefore, in addressing the as-applied constitutionality of the "use" and "disclosure" provisions, the district court did *not* consider defendants' participation concerning the interceptions, such as Riggs advising the Harmans to record complete conversations. But, such participation, even if *not* rising to the

44

level of "procuring" or "obtaining" the Harmans to make the interceptions, is a factor that must be considered in our *de novo* review of the summary judgment awarded defendants on their claim that, on the facts in this case, the "use" and "disclosure" provisions are unconstitutional.

Regarding such participation, there is a material fact issue for the Texas "obtains" claim. And, even though the Peavys *cannot* bring an action/obtain damages if defendants, in violation of the Federal Act, "procured" the Harmans to make the interceptions, such "procurement" *vel non* (for which there is also a material fact issue) has a bearing on whether the contents of the interceptions were *lawfully received* by defendants. If *not lawfully received*, this obviously changes the scope of the issue to be addressed for this as-applied challenge.

Because of the material fact issue on "procure/obtain" and the linkage of such conduct to whether defendants "lawfully received" the tapes, the as-applied constitutional issue arguably could be avoided now, by remanding it for reconsideration by the district court at trial. Three considerations cut against doing so.

First, as discussed *infra*, defendants', especially Riggs', participation concerning the interceptions, together with the other factors considered *infra*, compels our upholding the constitutionality of the "use" and "disclosure" provisions of the

45

Federal and Texas Acts.  In short, further evidence is *not* needed for this issue.

Second, if we remanded this constitutional issue for trial (further evidence), in an attempt to avoid reaching it, our reaching it would probably simply be delayed, instead, and at great cost in time and expense to the parties and district court. Because of the summary judgment posture of this case, such avoidance of the constitutional issue at this stage would *not* be prudential.  "The flame is not worth the candle."

Third, and related to the second consideration, even if the Peavys prevail at trial on their Texas "obtains" claim, that would *not* obviate the necessity of the constitutionality of the "use" and "disclosure" provisions being addressed, because, notwithstanding whether defendants may be liable for damages for "obtaining" another to make the interceptions, in violation of the Texas Act, both Acts also authorize separate damages for each "use" or "disclosure" violation. *See* **Fultz v. Gilliam**, 942 F.2d 396, 402 (6th Cir. 1991) ("The text of the [Federal Act] plainly indicates, and its purpose necessitates, that a new and discrete cause of action accrue ... each time a recording of an unlawfully intercepted communication is played to a third party who has not yet heard it."); **Bess v. Bess**, 929 F.2d 1332, 1334 (8th Cir. 1991) (plaintiff awarded damages for each of 12 days of interception, as well as additional statutory damages for use of contents).

46

In this respect, in permitted civil actions for violation of the Federal Act, "the court may assess as damages whichever is the greater of ... the sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation; or ... statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000". 18 U.S.C. § 2520(c)(2). Punitive damages, reasonable attorney's fees, and costs are also authorized. 18 U.S.C. § 2520(b). Likewise, under the Texas Act, a person may recover, *inter alia*, $1,000 statutory damages, actual damages in excess of $1,000, punitive damages, and reasonable attorney's fees and costs. TEX. CIV. PRAC. & REM. CODE § 123.004.

Accordingly, the more narrow issue before us is whether, on the facts in this case, the First Amendment is violated by the Federal and Texas Acts, as applied to the use and disclosure of illegally intercepted communications about matters of public significance, by persons who: knew, or had reason to know, the communications were intercepted in violation of the Acts; but who *did not* themselves make the interceptions; but who *did* have undisputed participation concerning the interceptions to the extent defendants did.

1.

a.

47

Defendants urge the district court was correct in applying strict scrutiny and concluding that, absent a government interest of the highest order, the First Amendment prohibits punishing the media for using and disclosing "lawfully-received", truthful information about matters of public significance. Therefore, defendants claim the "use" and "disclosure" provisions are unconstitutional as applied to them. (Their alternative, facial challenge to the constitutionality of those provisions, based on vagueness and overbreadth, is discussed *infra*.)

Of course, because defendants violated the use/disclosure provisions as a matter of law, as well as it being undisputed that defendants, especially Riggs, did participate to some extent concerning the interceptions, and as well as there being a material fact issue whether defendants "procured" or "obtained" the Harmans to make the interceptions, it is quite questionable, as discussed *infra*, that defendants "lawfully received" the intercepted contents. In any event, they rely primarily on the Supreme Court's decisions in **Landmark Communications, Inc. v. Virginia**, 435 U.S. 829 (1978); **Smith v. Daily Mail Publ'g Co.**, 443 U.S. 97 (1979); and **Florida Star**.

**Landmark** concerned a newspaper indicted for violating a Virginia statute which proscribed divulging information about proceedings before a state judicial review commission authorized to hear complaints about judges' disability or misconduct. 435 U.S.

48

at 830.  The newspaper accurately reported on an inquiry pending before the commission.  *Id*. at 831.

The "narrow and limited question presented" was "whether the First Amendment permits the criminal punishment of third persons who are strangers to the inquiry, including the news media, for divulging or publishing truthful information regarding confidential proceedings of the [commission]".  *Id*. at 837.  The Court held: "[T]he publication Virginia seeks to punish under its statute lies near the core of the First Amendment, and [Virginia's] interests advanced by the imposition of criminal sanctions are insufficient to justify the actual and potential encroachments on freedom of speech and of the press which follow therefrom".  *Id*. at 838.

The Court, however, was *not* "concerned with the possible applicability of the statute to one who *secures the information by illegal means and thereafter divulges it*".  *Id*. at 837 (emphasis added).  (Again, there are material fact issues whether defendants "procured" or "obtained" the Harmans to make the illegal interceptions.)

At issue in ***Daily Mail*** was a West Virginia statute which singled out newspapers for criminal sanctions if a juvenile offender's name was published without written approval of the juvenile court.  443 U.S. at 98.  Through routine monitoring of a police radio frequency, two newspapers learned about the shooting death of a student, and immediately sent reporters and

49

photographers to the school where the incident occurred. *Id*. at 99. Reporters there obtained the name of the alleged assailant, a minor, from witnesses, the police, and a prosecutor. *Id*.

Both newspapers were indicted under the statute for publishing articles about the incident. *Id*. at 99-100. One did *not* mention the alleged shooter's name in its first article, published the afternoon of the shooting, because of the statute's prohibition; but, both named him in articles published the next day, after at least three different radio stations had broadcast his name. *Id*. at 99-100.

The Court concluded that the statute did *not* satisfy the constitutional standards applied in **Landmark**. *Id*. at 102. "[Our] recent decisions demonstrate that state action to punish the publication of truthful information seldom can satisfy constitutional standards", *id*.; and those opinions "suggest strongly that if a newspaper *lawfully* obtains truthful information about a matter of public significance then state officials may *not* constitutionally punish publication of the information, absent a need to further a state interest of the highest order". *Id*. at 103 (emphasis added).[1]

_____

[1]In addition to citing **Landmark**, the Court cited **Cox Broad. Corp. v. Cohn**, 420 U.S. 469 (1975) (where rape victim's name became known to public through official court records dealing with rapist's trial, damages could *not* be recovered against newspaper for publishing victim's name in violation of state statute that criminalized such publication); and **Oklahoma Publ'g Co. v. District**

50

The Court stated that, "even assuming the statute served a state interest of the highest order [protecting anonymity of juvenile offenders], it does not accomplish its stated purpose", because it applied *only to newspapers*, and thus did *not* prevent publication by other media. *Id*. at 105. The Court pointed out, however: its holding was "narrow"; and *no issue of privacy was involved*. *Id*.

*Florida Star* concerned a Florida statute which made it unlawful to "print, publish, or broadcast ... [a sex offense victim's name] in any instrument of mass communication". 491 U.S. at 526 (internal quotation marks and citation omitted). A newspaper published a rape victim's name after obtaining it from a publicly released police report. The newspaper was held liable in an action by the victim based on violation of the statute. *Id*. at 526.

Although the Court ultimately concluded that such imposition of damages violated the First Amendment, it refused the newspaper's

---

*Court*, 430 U.S. 308 (1977) (vacating injunction prohibiting news media from publishing name or photograph of juvenile, where, despite state statute closing juvenile trials to public, judge had permitted reporters and other members of public to attend court hearing, because state *cannot* constitutionally restrain dissemination of truthful information in public domain). *Daily Mail*, 443 U.S. at 102-03. Although those "cases involved situations where the government itself provided or made possible press access to the information", *id*. at 103, the Court said that factor was "not controlling", *id*., because "[a] free press cannot be made to rely solely upon the sufferance of government to supply it with information". *Id*. at 104.

51

invitation to hold broadly "that the press may never be punished, civilly or criminally, for publishing the truth". *Id*. at 531. Instead, "the sensitivity and significance of the interests presented in clashes between First Amendment and privacy rights counsel relying on limited principles that sweep no more broadly than the appropriate context of the instant case". *Id*. at 533.

The principle from **Daily Mail** was applied: "[I]f a newspaper *lawfully* obtains truthful information about a matter of public significance then state officials may *not* constitutionally punish publication of the information, absent a need to further a state interest of the highest order". *Id*. (emphasis added; internal quotation marks and citation omitted). In addition to "the overarching public interest, secured by the Constitution, in the dissemination of truth", three additional considerations supported "[a]ccording the press the ample protection provided by that principle". *Id*. at 534 (internal quotation marks and citation omitted).

First, "because the **Daily Mail** formulation only protects the publication of information which a newspaper has *lawfully* obtained, the government retains ample means of safeguarding significant interests upon which publication may impinge". *Id*. at 534 (emphasis added; internal quotation marks and citation omitted). Especially significant for the purposes of the case at hand, the Court noted: "To the extent sensitive information *rests in private*

52

*hands*, the government may under some circumstances forbid its nonconsensual acquisition, thereby bringing outside of the *Daily Mail* principle the publication of any information so acquired". *Id.* (emphasis added).

Second, "punishing the press for its dissemination of information ... *already publicly available* is relatively unlikely to advance the interests in the service of which the State seeks to act". *Id.* at 535 (emphasis added).

The third, and final, consideration supporting application of the *Daily Mail* principle was the "timidity and self-censorship which may result from allowing the media to be punished for publishing certain truthful information". *Id.* (internal quotation marks and citation omitted). Such "fear of excessive media self-suppression" was applicable to "information released, without qualification, by the government". *Id.* at 535-36.

Applying *Daily Mail*, the Court held the newspaper could *not* be held civilly liable, because: (1) it had "*lawfully* obtained truthful information about a matter of public significance", *id.* (emphasis added; internal quotation marks and citation omitted); and (2) although the state's interests in protecting rape victims' privacy and physical safety and encouraging them to report sex offenses without fear of exposure are "highly significant interests", imposing liability for publication under the circumstances of that case was "too precipitous a means of

53

advancing" those interests, *id*. at 537, because (a) the government
provided the information to the media, which "ma[d]e it especially
likely that, if liability were to be imposed, self-censorship would
result", *id*. at 538; (b) under the negligence *per se* standard
applied by Florida courts, liability follows automatically from
publication, without "a scienter requirement of any kind ...,
engendering the perverse result that truthful publications
challenged pursuant to this cause of action are less protected by
the First Amendment than even the least protected defamatory
falsehoods", *id*. at 539; and (c) the statute was facially
underinclusive, because it proscribed publication only by an
"instrument of mass communication", but not by other means, *id*. at
540.

The Court stressed the "limited" nature of its holding:

> We do *not* hold that truthful publication is
> automatically constitutionally protected, *or*
> *that there is no zone of personal privacy*
> *within which the State may protect the*
> *individual from intrusion by the press*, or
> even that a State may never punish publication
> of the name of a victim of a sexual offense.
> We hold only that where a newspaper publishes
> truthful information *which it has lawfully*
> *obtained*, punishment may lawfully be imposed,
> if at all, only when narrowly tailored to a
> state interest of the highest order, and that
> no such interest is satisfactorily served by
> imposing liability ... *under the facts of this*
> *case*.

*Id*. at 541 (emphasis added).

54

Footnote eight, extremely relevant to the case at hand, stated: "The *Daily Mail* principle does *not* settle the issue whether, in cases where information has been acquired *unlawfully by a newspaper or by a source*, government may ever punish not only the unlawful acquisition, but the ensuing publication as well". *Id*. at 535 n.8 ("unlawfully" emphasized in original; other emphasis added).

## b.

The Peavys and the United States urge that distinctions between the Federal and Texas Acts and the statutes at issue in *Florida Star*, *Daily Mail*, and *Landmark* make inapplicable the analysis applied in those cases. They rely heavily on the fact that those statutes, unlike the Wiretap Acts, restricted speech on the basis of content; penalized the disclosure of information without imposing any underlying limitation on its acquisition; and, in *Florida Star*, sanctioned the media for publishing information provided by the government.

Pursuant to *United States v. O'Brien*, 391 U.S. 367 (1968), the Peavys and the United States claim the Wiretap Acts are subject only to *intermediate* First Amendment scrutiny, because they are content-neutral laws of general applicability, which do *not* single out the media for special burdens, and have only an incidental effect on its ability to gather and report the news. They also

55

rely on **Branzburg v. Hayes**, 408 U.S. 665 (1972); and **Cohen v. Cowles Media Co.**, 501 U.S. 663 (1991).

In **O'Brien**, a person convicted for burning his draft card made a First Amendment challenge to a federal statute which criminalized, *inter alia*, such knowing destruction. 391 U.S. at 370. The statute was held constitutional, facially and as applied. **Id**. at 372.

The Court noted that, on its face, the statute did *not* abridge free speech, but instead dealt "with conduct having no connection with speech"; and "there is nothing necessarily expressive" involved in O'Brien's conduct. **Id**. at 375. It refused to "accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea". **Id**. at 376. But, even assuming "the alleged communicative element in O'Brien's conduct [was] sufficient to bring into play the First Amendment, it [did] not necessarily follow that the [card's] destruction ... is constitutionally protected activity". **Id**.

The statute was held to satisfy the level of scrutiny applied when "'speech' and 'nonspeech' elements are combined in the same course of conduct". **Id**. at 376-77.

> [A] government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is

56

> unrelated to the suppression of free
> expression; and if the incidental restriction
> on alleged First Amendment freedoms is no
> greater than is essential to the furtherance
> of that interest.

*Id.* at 377.

At issue in **Branzburg** was "whether requiring newsmen to appear and testify before ... grand juries abridges the freedom of speech and press guaranteed by the First Amendment". 408 U.S. at 667. The reporters maintained that, in order to gather news, they often had to agree either *not* to identify the source of published information, or to publish only a portion of the facts revealed by him. *Id.* at 679.

In holding newsmen could be required to so testify, the Court pointed out it was *not* suggesting "news gathering does not qualify for First Amendment protection [, because] without some protection for seeking out the news, freedom of the press could be eviscerated". *Id.* at 681. On the other hand, "[i]t is clear that the First Amendment does not invalidate every incidental burdening of the press that may result from the enforcement of civil or criminal statutes of general applicability". *Id.* at 682. Similarly, "[i]t has generally been held that the First Amendment does *not* guarantee the press a constitutional right of special access to information *not* available to the public generally". *Id.* at 684 (emphasis added).

57

The Court declined to "grant newsmen a testimonial privilege that other citizens do not enjoy", because it "perceive[d] no basis for holding that the public interest in law enforcement and in ensuring effective grand jury proceedings is insufficient to override the consequential, but uncertain, burden on news gathering that is said to result from insisting that reporters, like other citizens, respond to relevant questions put to them in the course of a valid grand jury investigation".  *Id*. at 690-91.

Of particular interest for the case at hand is this observation:

> *It would be frivolous to assert ... that the First Amendment, in the interest of securing news or otherwise, confers a license on either the reporter or his news sources to violate valid criminal laws.  Although* stealing documents or *private wiretapping could provide newsworthy information*, neither reporter nor source is immune from conviction for such conduct, whatever the impact on the flow of news....  *The Amendment does not reach so far as to override the interest of the public in ensuring that neither reporter nor source is invading the rights of other citizens through reprehensible conduct forbidden to all other persons.*

*Id*. at 691-92 (emphasis added).

*Cohen* concerned "whether the First Amendment prohibits a plaintiff from recovering damages, under state promissory estoppel law, for a newspaper's breach of a promise of confidentiality given to the plaintiff in exchange for information".  501 U.S. at 665.

58

Holding that it does *not*, the Court refused to apply the analysis used in *Landmark*, *Daily Mail*, and *Florida Star*.  *Id*. at 668-69.

Instead, controlling was "the equally well-established line of decisions holding that generally applicable laws do *not* offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news".  *Id*. at 669 (emphasis added).[2]  The *Florida Star* line of cases was distinguished on the ground that "the truthful information sought to be published must have been *lawfully acquired*.  The press may not with impunity break and enter an office or dwelling to gather news".  *Id*. (emphasis added).

"It is ... beyond dispute that the publisher of a newspaper has no special immunity from the application of general laws [and] has no special privilege to invade the rights and liberties of

---

[2]For illustrating such generally applicable laws, the enforcement of which have incidental effects on the media's ability to gather and report news, *Cohen* cited the following cases, all but two of which concern commercial regulation: *University of Pa. v. E.E.O.C.*, 493 U.S. 182, 201-02 (1990) (must pay non-discriminatory taxes); *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 581-83 (1983) (same); *Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562, 576-79 (1977) (may *not* publish copyrighted material without obeying copyright laws); *Branzburg*; *Citizen Publ'g Co. v. United States*, 394 U.S. 131, 139 (1969) (may *not* restrain trade in violation of antitrust laws); *Oklahoma Press Publ'g Co. v. Walling*, 327 U.S. 186, 192-93 (1946) (must comply with Fair Labor Standards Act); *Associated Press v. United States*, 326 U.S. 1 (1945) (may *not* restrain trade in violation of antitrust laws); *Murdock v. Pennsylvania*, 319 U.S. 105, 112 (1943) (must pay non-discriminatory taxes); and *Associated Press v. National Labor Relations Bd.*, 301 U.S. 103 (1937) (must comply with National Labor Relations Act).

others." *Id*. at 670 (internal quotation marks and citation omitted). Therefore, "enforcement of such general laws against the press is not subject to stricter scrutiny than would be applied to enforcement against other persons or organizations". *Id*.

Minnesota's doctrine of promissory estoppel was "a law of general applicability", because it did "not target or single out the press", but was "generally applicable to the daily transactions of all the citizens of Minnesota". *Id*. Accordingly, "[t]he First Amendment d[id] not forbid its application to the press". *Id*.

Applying that estoppel doctrine to the newspapers would *not* punish them for publishing lawfully-obtained, truthful information, because "compensatory damages are not a form of punishment" and, "[i]n any event, ... the characterization of the payment makes no difference for First Amendment purposes when the law being applied is a general law and does not single out the press". *Id*.

*Florida Star* and *Daily Mail* were distinguished: "In those cases, the State itself defined the content of publications that would trigger liability"; in contrast, in *Cohen*, "[t]he parties themselves ... determine[d] the scope of their legal obligations, and any restrictions that may be placed on the publication of truthful information are self-imposed". *Id*. at 670-71.

In addition, it was "not at all clear that [the newspaper] obtained Cohen's name '*lawfully*' ..., at least for purposes of publishing it", because it obtained it "only by making a promise

60

... [it] did not honor". *Id*. at 671 (emphasis added). The dissenting opinions' suggestion "that the press should not be subject to any law ... which in any fashion or to any degree limits or restricts the press' right to report truthful information" was rejected, because "[t]he First Amendment does not grant the press such limitless protection". *Id*.

*Cohen* concluded that, if permitting a promissory estoppel claim had the effect of "inhibit[ing] truthful reporting because news organizations will have legal incentives not to disclose a confidential source's identity even when that person's identity is itself newsworthy", then it was "no more than the incidental, and constitutionally insignificant, consequence of applying to the press a generally applicable law that requires those who make certain kinds of promises to keep them". *Id*. at 671-72.

c.

Two recent cases from other circuits have addressed the level of scrutiny for the constitutionality *vel non* of the Federal Act: *Bartnicki v. Vopper*, 200 F.3d 109 (3d Cir. 1999), *cert. granted*, 68 U.S.L.W. 3685, 3698 (U.S. 26 June 2000) (Nos. 99-1687 and 99-1728); *Boehner v. McDermott*, 191 F.3d 463 (D.C. Cir. 1999), *petition for cert. filed*, 68 U.S.L.W. 3686 (U.S. 25 Apr. 2000) (No. 99-1709).

In *Boehner*, a Florida couple, using a radio scanner, intercepted and recorded a telephone conversation between Congressman Boehner, a Republican member of the House of

61

Representatives, and members of his Party. 191 F.3d at 464-65. The couple delivered the tape to Congressman McDermott, then the ranking Democratic member of the House Ethics Committee, explaining by cover letter the tape contained "a conference call heard over a scanner". *Id*. at 465. Congressman McDermott gave copies of the tape to three newspapers, each of which published an article about the intercepted conversation. *Id*.

Congressman Boehner filed a civil action against Congressman McDermott (but *not* the newspapers) for violating § 2511(1)(c) (disclosure). *Id*. The district court agreed with Congressman McDermott that § 2511(1)(c), as applied to him, violated the First Amendment. *Id*. at 466. The court of appeals (split panel) reversed, applying *intermediate* scrutiny. *Id*. 467-70.

The majority opinion observed that "the *O'Brien* analysis applies to statutes containing generally applicable, content-neutral prohibitions on conduct that create incidental burdens on speech". *Id*. at 467. Section 2511(1)(c) fit that description because, to the extent it proscribes disclosures which "entail constitutionally protected speech, the statute regulates it without reference to content", *id*. at 468; and it furthers a substantial governmental interest unrelated to the suppression of free expression because, "rather than impinging on speech, ... [it] promotes the freedom of speech". *Id*.

62

The incidental restriction on speech imposed by § 2511(1)(c) was "no greater than is essential to the furtherance" of the government's substantial interests: "[W]ithout [that] prohibition ..., the government would have no means to prevent the disclosure of private information, because criminals like [the intercepting Florida couple] can literally launder illegally intercepted information and there would be almost no force to deter exposure of any intercepted secret". *Id*. at 470 (internal quotation marks and citation omitted).

The majority, for separate reasons, distinguished *Florida Star*. One member concluded it had *no* application for a host of reasons, including: § 2511(1)(c) is *not* directed at the press; it seeks to protect the privacy of private, *not* public, communications; and it has a scienter requirement. *Id*. at 471-76. The other majority-member assumed, without deciding, that *Florida Star* "applies in principle" but, because Congressman McDermott did *not lawfully* obtain the tape, § 2511(1)(c) was subject to intermediate scrutiny as applied to him. *Id*. at 479.

For *Bartnicki*, as noted, the Court granted certiorari in June 2000. The case concerned an unknown person intercepting and recording a cellular telephone conversation, regarding a teachers' pay raise, between Kane, a teachers' union president, and Bartnicki, a union negotiator. 200 F.3d at 113. The anonymous interceptor left the tape in the mailbox of Yocum, the president of

a citizens' organization opposed to the union's proposals. *Id*. After listening to the tape, Yocum gave copies to local radio stations, which broadcast parts of it. *Id*.

Bartnicki and Kane sued Yocum *and* the media defendants for violating § 2511(1)(c) and (d) (disclosure and use), and similar provisions of a Pennsylvania statute. *Id*. Relying primarily on **Cohen**, the district court denied summary judgment for defendants, holding that the use and disclosure provisions were generally applicable laws that did *not* single out the media or purposefully restrict free expression, and could be applied to the media without offending the First Amendment. *Id*. at 118.

On interlocutory appeal, the Third Circuit panel majority rejected the media defendants' contention that **Daily Mail** controlled, because **Florida Star** footnote eight, quoted *supra* and *infra,* "explicitly repudiated any suggestion that [**Daily Mail**] answers ... whether a statute that limits the dissemination of information *obtained by means of questionable legality* is subject to First Amendment scrutiny". *Id*. at 117 (emphasis added). The court did *not* resolve whether the damages provisions of the Federal and Pennsylvania Acts were generally applicable laws, because the district court, "by suggesting that generally applicable laws do not require First Amendment scrutiny when applied to the press, ... read ... **Cohen** too broadly". *Id*. at 118. Instead, the court

64

interpreted **Cohen** to hold "that a law of general applicability, which neither targets nor imposes disproportionate burdens upon the press, is enforceable against the press to the same extent that it is enforceable against individuals or organizations". *Id*. at 119.

As in the case at hand, the United States intervened in **Bartnicki** to defend the constitutionality of the Federal Wiretap Act. It claimed the use and disclosure provisions are subject to intermediate scrutiny for two reasons: (1) they are generally applicable laws imposing only incidental burdens on expression; and (2) to the extent the provisions restrict speech in particular cases, they do so in a content-neutral manner. *Id*.

The court rejected the first contention: "[W]hen a statute that regulates both speech and conduct is applied to an act of pure speech, that statute must meet the same degree of First Amendment scrutiny as a statute that regulates speech alone". *Id*. at 121.

But, it agreed that the use and disclosure provisions are content-neutral, because the justification for proscribing such conduct — strengthening "the underlying ban on unauthorized interception, by denying the wrongdoer the fruits of his labor and by eliminating the demand for those fruits by third parties" — "does *not* rely on the communicative impact of speech". *Id*. at 123 (emphasis added; internal quotation marks and citation omitted).

Applying intermediate scrutiny, the court held the "government's interest in protecting privacy by helping maintain

65

the confidentiality of [covered] communications ... is a significant state interest". *Id*. at 125 (internal quotation marks and citation omitted).

In this regard, the use and disclosure proscriptions, according to United States, furthered government's interests in protecting the privacy of covered communications in two ways: "(1) by denying the wrongdoer the fruits of his labor and (2) by eliminating the demand for those fruits by third parties". *Id*. (internal quotation marks and citation omitted). The court stated the first was inapplicable, because, unlike here, there was *no* evidence defendants encouraged or participated in the interception. *Id*. Accordingly, with respect to the second, "[t]he connection between prohibiting third parties from using or disclosing intercepted material and preventing the initial interception is indirect at best". *Id*. at 125-26.

It concluded, therefore, that the use and disclosure provisions, as applied to defendants *not connected* with the interception, were *not* narrowly tailored to serve the government's interests. *Id*. at 126. Because persons who indirectly participated in the interception could be punished under the statute, "the government's desired effect can be reached by enforcement of existing provisions against the responsible parties rather than by imposing damages on these defendants". *Id*.

66

The court distinguished **Boehner** on the ground, among others, that, unlike Yocum, who found the tape of the intercepted conversation in his mailbox, Congressman McDermott, in **Boehner**, entered into a transaction with the interceptors when he accepted the tape from them. *Id*. at 128-29.

On the facts in **Bartnicki** (obviously, quite different from those here), the court concluded "that the government's significant interest in protecting privacy is not sufficient to justify the serious burdens the damages provisions of the Wiretapping Acts place on free speech". *Id*. at 129. It therefore held the Acts "fail the test of *intermediate scrutiny* and may *not* constitutionally be applied to penalize the use or disclosure of illegally intercepted information *where [, unlike here,] there is no allegation that the defendants participated in or encouraged that interception*". *Id*. (emphasis added).

d.

In the light of the foregoing jurisprudence, we must decide what level of First Amendment scrutiny is appropriate in determining whether defendants can be subject to civil liability for use and disclosure of illegally-intercepted private telephone conversations, which they received directly from the interceptors, *with full knowledge of the circumstances of the interceptions and with some participation concerning the interceptions*. None of the foregoing cases addressed this precise question.

67

*Florida Star* is similar to this case in that the Peavys are seeking to hold defendants civilly liable for, *inter alia*, publication of truthful information. And, the governmental interests supporting the Federal and Texas Acts and the Florida statute are similar in that they seek to protect privacy; accordingly, this case, like *Florida Star*, involves balancing privacy and free press interests.

But, *Florida Star* is distinguishable in numerous ways. Unlike the Florida statute, which restricted speech on the basis of content, the Wiretap Acts, except under certain limited circumstances *not* present here, prohibit use and disclosure of *all* illegal interceptions, irrespective of their subject matter. The use and disclosure restrictions are instead based on the manner in which the information is acquired.

The statutes at issue in *Daily Mail* and *Landmark* also were content-based restrictions on speech. We recognize that the Court did *not* rely on the content-based nature of the statutes in deciding to apply strict scrutiny in those cases. Nevertheless, that distinction exists and is worthy of note, inasmuch as content-based regulations of expression are subject to strict scrutiny, irrespective of whether they prohibit the publication of *lawfully-obtained* information. *See Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994) ("Our precedents ... apply the most exacting

68

scrutiny to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content").

The statute in *Florida Star* targeted a segment of the media ("any instrument of mass communication"); but, the Federal and Texas Acts do *not* single out the media for special burdens. Instead, they apply to "any person" who uses or discloses illegally-intercepted communications, if he *knows or has reason to know* of the interception's illegality. Also unlike the Federal and Texas Acts, the Florida statute did *not* require proof of scienter.

Moreover, none of the considerations underlying the Court's application of the *Daily Mail* principle in *Florida Star* are present here. The first consideration — government's retention of ample means of safeguarding significant interests upon which publication may impinge — is inapplicable. Unlike the reporter in *Florida Star*, who obtained the victim's name from public records made available by the government (far from it), the contents of the Peavys' conversations had *not* been entrusted to the government, but were instead given to defendants by private individuals who intercepted them illegally. "To the extent sensitive information rests in private hands, the government may under some circumstances forbid its nonconsensual acquisition, thereby bringing outside of the *Daily Mail* principle the publication of any information so acquired". *Florida Star*, 491 U.S. at 534.

69

Moreover, in the light of our affirming that, as a matter of law, defendants violated the use and disclosure provisions, they *knew or should have known* the interceptions were illegal. In addition, defendants had some participation concerning the interceptions. (Moreover, there are material fact issues for whether they "procured" or "obtained" the Harmans to make the illegal interceptions. This bears also on defendants' knowledge of illegal interceptions.) Therefore, as noted, it is quite arguable that defendants did *not lawfully* receive the contents of the tapes. *See* **Boehner**, 191 F.3d at 479 (Ginsburg, J., concurring) (even if the receipt of the tape containing the illegally intercepted call was lawful, "[o]ne who obtains information in an illegal transaction, with full knowledge the transaction is illegal, has not 'lawfully obtain[ed]' that information in any meaningful sense").

The second **Florida Star** consideration — "the fact that punishing the press for its dissemination of information which is already publicly available is relatively unlikely to advance the interests in the service of which [government] seeks to act", **id**. at 535 — is likewise inapplicable, because the contents of the Peavys' conversations were *not* publicly available or in the public domain when defendants received, used, and disclosed them.

The final **Florida Star** consideration — "the timidity and self-censorship which may result from allowing the media to be punished

70

for publishing certain truthful information", *id*. (internal quotation marks and citation omitted) — presents a somewhat closer question. Nevertheless, the Court's concern in that respect seemed to be limited to "information released, without qualification, by the government". *Id*. at 536. "A contrary rule, depriving protection to those *who rely on the government's implied representations of the lawfulness of dissemination*, would force upon the media the onerous obligation of sifting through government ... pronouncements to prune out material arguably unlawful for publication". *Id*. Here, the only representation government has made regarding the lawfulness of use and disclosure of illegal interceptions is in the Federal and Texas Acts prohibiting such conduct. Again, that prohibition applies *only* if the using or disclosing person does so "intentionally", and "knows or has reason to know" the interceptions were illegal.

Accordingly, the Acts do *not* impose an "onerous obligation" on the media. Instead, it is subject to the obligation imposed on *all* citizens: the duty *not* to use or disclose interceptions, knowing or having reason to know they were in violation of the Wiretap Acts.

In the light of that scienter requirement, we think it highly unlikely such an obligation will result in "timidity and self-censorship" because, as stated in the *Bartnicki* dissent:

71

> One would suppose that a responsible journalist ... would be unlikely to propose publication of a ... conversation without some effort to insure that [it] in fact took place and to authenticate the identities of the parties to [it].  As part of such an inquiry, the question whether the parties to the conversation had authorized its recording and release, or whether others had lawfully intercepted the conversation, would seem naturally to arise.  Moreover, current technology would make it relatively easy to determine whether the conversation had been the subject of a prior press or broadcast report.

*Bartnicki*, 200 F.3d at 135 (Pollak, J., dissenting).  These observations are all the more compelling here, in that defendants had some participation concerning the interceptions.

Finally, and perhaps most important, is *Florida Star* footnote eight:  "The *Daily Mail* principle *does not settle the issue whether, in cases where information has been acquired unlawfully* by a newspaper or *by a source*, government may ever punish not only the unlawful acquisition, but the ensuing publication as well." *Id*. at 535 n.8 ("unlawfully" emphasized in original; other emphasis added).  Expressly reserved was the question at issue here.  But, as a member of the majority observed separately in *Boehner*, the *Branzburg* Court may have shed some light on the answer to that question:  the First Amendment "does not reach so far as to override the interest of the public in ensuring that *neither reporter nor source* is invading the rights of other citizens through represensible conduct forbidden to other persons".

72

*Boehner*, 191 F.3d at 473 (separate opinion of Randolph, J. (quoting *Branzburg*, 408 U.S. at 691-92) (emphasis added)).

Likewise, the intermediate scrutiny cases advanced by the Peavys and the United States are distinguishable.  The statute at issue in *O'Brien* was targeted at conduct (proscribed knowingly destroying draft card) and imposed *no* restrictions on the media's publication of truthful information.  And, the publication restriction in *Cohen* was self-imposed.

*Bartnicki* and *Boehner* are also distinguishable.  Media liability for publication was *not* at issue in *Boehner*; and the media defendants in *Bartnicki*, *unlike Riggs and WFAA*, were *not* in any way involved with the interceptors, or the interceptions, but instead received the interceptions from a third party, in whose mailbox the anonymous interceptor had left the tape of the intercepted communications.

Considering these cases, and the distinctions between them and the case at hand, we conclude that the use and disclosure provisions, *as applied to Riggs and WFAA*, must satisfy "the intermediate level of scrutiny applicable to content-neutral restrictions that impose an incidental burden on speech".  *Turner,* 512 U.S. at 662.

Along this line, we reject defendants' contention that the Federal and Texas Acts impose more than an "incidental" burden on the gathering and reporting of news.

According to defendants, a burden on the media can be characterized as "incidental" only if it indirectly affects newsgathering and publication, or subjects the media to non-discriminatory economic regulation. Defendants claim the Acts *directly* affect newsgathering and reporting because they completely proscribe use and disclosure of *all* contents of interceptions.

Defendants interpret too broadly what constitutes an "incidental" effect. The Acts restrict use and disclosure of information based solely on the means by which it is acquired, and the restriction applies *only* if the using or disclosing person knows, or has reason to know, of the illegal manner of acquisition. Accordingly, the Acts do *not* prohibit gathering and publishing the same information, acquired from other sources.

2.

Under *O'Brien*'s intermediate scrutiny analysis, "a content-neutral regulation [such as the Federal and Texas Wiretap Acts] will be sustained if" the regulation

> furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*Turner*, 512 U.S. at 662 (quoting *O'Brien*, 391 U.S. at 377).

The Wiretap Acts satisfy intermediate scrutiny, according to the United States and the Peavys, because: (1) the United States

74

and Texas each have a substantial interest in maintaining the confidentiality of private communications; (2) the use and disclosure proscriptions are unrelated to the suppression of speech, because liability is based on the *means of acquisition* of the information, rather than the content, and the Acts do *not* single out speech for special burdens, but prohibit *all* unauthorized uses and disclosures; and (3) the incidental burdens on speech are *not* impermissibly broad, because disclosure is *not* singled out for special burdens, and the Acts do *not* prohibit the use or disclosure of the same information obtained by non-prohibited means.

The use and disclosure provisions, in defendants' view, fail intermediate scrutiny because they impose an absolute, categorical ban on speech and expressive conduct, which burdens substantially more speech than is necessary to further government's legitimate interests in protecting privacy.

a.

One of the "dual purposes" of the Federal Act is "protecting the privacy of [covered] communications". *Gelbard v. United States*, 408 U.S. 41, 48 (1972) (quoting S. Rep. No. 1097, 90th Cong., 2d Sess., 66 (1968)); *see also* *United States v. Cianfrani*, 573 F.2d 835, 855 (3d Cir. 1978) ("protection of privacy was an overriding congressional concern" in enacting Federal Act). It does so by proscribing *not only* unauthorized interception, §

75

2511(1)(a), but also the intentional use and disclosure of illegal interceptions, § 2511(c) and (d). The purpose of the use and disclosure proscriptions is to reinforce the interception proscription by "denying the wrongdoer the fruits of his conduct", *Fultz*, 942 F.2d at 401, and by eliminating the demand for those fruits by third parties. *Boehner*, 191 F.3d at 469-70.

> [P]rotection of the privacy of communications is vital to our society. We depend upon the free interchange of ideas and information. And we are dedicated to the proposition that each individual should be free from unwarranted intrusion into his private affairs. Both these interests are threatened by modern techniques of electronic surveillance, however, since it is now possible to record surreptitiously the most intimate conversations and to preserve them for later disclosure. Only by governing strictly both authorization [of interception] and disclosure of intercepted communications did Congress believe that such weighty interests could be protected adequately.

*Cianfrani*, 573 F.2d at 856.

The privacy interests protected by the Wiretap Acts are of constitutional dimension. *See* **Harper & Row Publishers, Inc. v. Nation Enters.,** 471 U.S. 539, 559 (1985) (although "essential thrust of the First Amendment is to prohibit improper restraints on the *voluntary* public expression of ideas", there is "a concomitant freedom *not* to speak publicly, one which serves the same ultimate end as freedom of speech in its affirmative aspect" (emphasis in original)); **Katz v. United States**, 389 U.S. 347, 352-53 (1967)

(Fourth Amendment protects privacy of telephone conversation from governmental intrusion by electronic surveillance).

And, the privacy interests sought to be protected by the Federal Act have been held to be "sufficiently weighty to justify some limitations in certain circumstances on the general right of access to court proceedings". *Cianfrani*, 573 F.2d at 856-57 (ordering pretrial hearings closed to public to extent reasonably necessary to protect against disclosure of unlawfully intercepted communications). *See also* **In re Grand Jury**, 111 F.3d 1066, 1074-75 (3d Cir. 1997) (privacy interests protected by Federal Act confer standing on wiretapping victims to quash subpoena *duces tecum* served on interceptor, who was a witness in grand jury investigation in which one of wiretapping victims was target).

In short, the United States and Texas have a substantial interest in protecting the confidentiality of private wire, oral, and electronic communications.

b.

And, that substantial interest is unrelated to the suppression of free expression. The use and disclosure proscriptions are directed *only* at the *means* by which information is acquired. They apply *only* if the targeted actor *knows, or has reason to know*, of the illegal means of acquisition. And, they do *not* prohibit use and disclosure of the information contained in illegal interceptions *if* such information is obtained from another source.

77

Indeed, protection of communications' confidentiality encourages, rather than suppresses, free expression, because the proscriptions against interception, use, and disclosure offer assurance to communicating parties that they can speak freely.

### c.

To satisfy the requirement that the incidental restriction on First Amendment freedom is no greater than essential to furtherance of the governmental interest, "a regulation need not be the least speech-restrictive means of advancing the Government's interests. Rather, the requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation". *Turner*, 512 U.S. at 662 (internal quotation marks and citations omitted). "Narrow tailoring in this context requires ... that the means chosen do not burden substantially more speech than is necessary to further the government's legitimate interests". *Id*. (internal quotation marks and citation omitted).

The use and disclosure proscriptions do *not* burden substantially more speech than is necessary to further governmental interests in protecting the privacy of communications. Those interests would be achieved less effectively in the absence of such proscriptions, because the invasion of privacy that occurs with interception does *not* then end, but continues anew and spreads with each disclosure or other use of the interception.

78

Prohibiting interception alone is *not* sufficient to protect the privacy of communications. Without the use and disclosure proscriptions, government's efforts to prohibit interception would be far less effective, because a person who illegally intercepts a conversation and wishes to disclose it to the public can do so, at no risk to himself, by simply anonymously providing the contents of the communication — by use of a tape or otherwise — to third parties, such as the media, who have an interest in disclosing, or otherwise using, those contents (as in **Bartnicki**). Moreover, far greater damage to the interests sought to be protected results if, and when, such contents are paraded before the public through use and disclosure by non-interceptors, including the media. *See* **Boehner**, 191 F.3d at 468, 470.

In sum, as applied to the facts in this case, including defendants' knowing or having reason to know the interceptions were illegal (to include their participation concerning the interceptions and their possible "procures" or "obtains" violations), the use and disclosure provisions of the Federal and Texas Acts satisfy intermediate scrutiny, because: they further substantial governmental interests in protecting the confidentiality of private communications; those interests are unrelated to the suppression of free expression, but instead encourage it; and the incidental burdens on free expression are no greater than is essential to the furtherance of those interests,

79

which would be achieved far less effectively in the absence of the proscriptions.

## E.

We reject defendants' alternative contention that the summary judgment should be affirmed because the Federal and Texas Acts are unconstitutionally vague and overbroad.

## 1.

The use and disclosure provisions give adequate notice of the conduct they prohibit, and are "not so vague that men of common intelligence must necessarily guess at [their] meaning". ***Broadrick v. Oklahoma***, 413 U.S. 601, 607 (1973) (internal quotation marks and citation omitted). As Riggs admitted in his deposition, there was nothing in the amended legislation that was vague or ambiguous; instead, Watler simply "missed the new legislation". Accordingly, if defendants misunderstood their legal obligations, it was because they and their attorney were unaware of the Acts' terms, *not* because they were vague. Defendants' contention that the distinction between "use" and "disclose" is unclear carries very little weight; each is subject to the same proscriptions and exceptions, and triggers the same penalties.

## 2.

The Acts are *not* unconstitutionally overbroad, because they do *not* sanction a substantial amount of constitutionally protected speech. The use and disclosure proscriptions do *not* prohibit such

80

conduct for information obtained by means other than illegal interceptions. And, the scienter requirements ameliorate the possibility that the prohibitions will result in chilling a substantial amount of protected speech.

F.

As noted, under the statutory exclusionary rule, § 2515, contents of illegally intercepted communications, as well as evidence derived therefrom, are *not* admissible in "any trial" if disclosure would violate the Federal Act. The Peavys contend the district court erred, in conjunction with the cross motions for summary judgment, by denying their motion to suppress the contents of the interceptions and evidence derived therefrom, and by allowing defendants to use such evidence to attack the Peavys' character and defend against their state law claims, as well as to support their (defendants') affirmative defenses.

In the light of our disposition of the other issues, we need *not* address this issue. The suppression motion ruling was *only* for summary judgment purposes. The district court has had *no* occasion to consider admissibility *vel non* of such evidence for trial.

III.

For the foregoing reasons, we **AFFIRM** the summary judgment insofar as it (1) dismissed the Peavys' claim for damages, under the Federal Act, for defendants' "procuring" the Harmans to make the interceptions, and (2) held, for contexts other than for their

81

television broadcasts, that, in violation of the Federal and Texas Acts, defendants "used" and "disclosed" the contents of the intercepted communications; **REVERSE** the summary judgment insofar as it (1) applied strict scrutiny and (2) held that the First Amendment precludes, under the Federal and Texas Acts, holding defendants civilly liable for "use" and "disclosure"; **VACATE** the summary judgment insofar as it (1) held that, under the Federal Act, defendants had *not* "procured" the Harmans to make the interceptions (this being a separate issue from the correct dismissal of the procurement action for damages), (2) dismissed the Peavys' claim, under the Texas Act, for so "obtaining" the Harmans, (3) dismissed the Peavys' claim, under Texas law, for civil conspiracy, and (4) held that, in violation of the Federal and Texas Acts, defendants, in their television broadcasts, "disclosed" the contents of the interceptions; and **REMAND** for further proceedings consistent with this opinion.

*AFFIRMED in part; REVERSED in part;*

*VACATED in part; and REMANDED*